OPINION
Canterbury Runn Apartments ("Canterbury") appeals from a judgment of the Vandalia Municipal Court finding it liable to appellee Tammy Stiffler for damages she incurred as a result of a water leak in her apartment.
Canterbury advances two assignments of error for our review. First, it contends that the municipal court lacked subject-matter jurisdiction to hear Stiffler's complaint. Second, it argues that the municipal court erred by finding it liable for money damages under R.C. Chapter 5321 and Ohio common law.
The present appeal stems from events that occurred while Stiffler was residing in a Canterbury apartment as a month-to-month tenant. On Sunday, May 27, 2001, she noticed water dripping from her kitchen ceiling. (Trial Transcript at 9). A few hours later, a maintenance man poked a hole in her kitchen ceiling to relieve the pressure and to allow the water to drain. (Id. at 10). The maintenance man told Stiffler that someone would repair the leak on Tuesday, May 29, 2001. (Id.). On that day, Stiffler left several messages at the apartment office, but no one returned her calls or repaired the leak. (Id.). By Wednesday, May 30, 2001, the leak had worsened. Water was running down her cabinets and onto her dishes, and mold was growing on her walls and carpet, which was becoming "flooded." (Id. at 11). In addition, the globes covering her light fixtures were filling with water. (Id.). After calling the office several times, Stiffler reached the manager, Patricia Kammer, on or about Thursday, May 31, 2001. (Id. at 58). Kammer sent "Moe from maintenance" to check the leak. (Id.). After investigating the problem, Moe initially informed Stiffler that an upstairs tenant's shower curtain had not been in place and had caused the leak in her apartment. (Id. at 58-59, 87-88, 95-96). When the leaking continued, he re-evaluated the problem and determined that the upstairs tenant's toilet was overflowing. (Id. at 97). As a result, he repaired the toilet, poked a hole in Stiffler's bathroom ceiling, and put a container under it to catch the water. (Id.). Thereafter, on June 4, 2001, Kammer again heard from Stiffler, who reported that her apartment was flooded and her "ceilings were ready to cave in." (Id. at 59). Moe and another maintenance man responded to Stiffler's complaint that same day. Moe punctured her kitchen and bathroom ceilings to allow the water to drain, and the other maintenance man extracted approximately 10 gallons of water from her carpet. (Id. at 34, 60, 116, 119). At some point, Moe also determined that the upstairs tenant's dishwasher line was leaking and causing water to flow into Stiffler's apartment below. (Id. at 97-98). After fixing the dishwasher, Moe returned to her apartment and cut out a three-foot by three-foot section of her ceiling, which had partially "caved in," and removed the wet insulation. (Id. at 60, 78, 99). At that time, he informed Stiffler that the ceiling needed to dry before it could be repaired. (Id. at 101). After speaking with Kammer, who explained that the drying process would take roughly three or four days, Stiffler agreed to move from her ground-floor apartment into an upstairs unit, which was the only unit available. (Id. at 30, 31, 48, 65). She later changed her mind, however, after discovering that she could not afford to hire movers to carry her heavy furniture up a staircase. (Id. at 31). On June 9, 2001, Stiffer vacated her apartment because the problem had not yet been remedied, and she moved into a one-story rental property owned by her father. (Id. at 37-38, 47). When Stiffler vacated her apartment, the water damage had not been repaired, despite the fact that she had called about it almost daily. (Id. at 34, 82). She returned her apartment keys to Kammer on either June 11, 2001, or June 18, 2001. (Id. at 72-73). Kammer subsequently charged Stiffer rent from June 1, 2001, through June 9, 2001, and deducted this amount from her security deposit. (Id. at 73-74).
On July 13, 2001, Stiffler filed a small claims complaint for money damages against Canterbury. (Doc. #1). In particular, she sought compensation for property damage, moving expenses and utility expenses totaling $2,000. At Canterbury's request, the case was transferred to the regular docket of the Vandalia Municipal Court. Following a December 17, 2001, bench trial, a magistrate ruled in Stiffler's favor and awarded her $1,391.52 in damages. (Doc. #9). On March 28, 2002, the trial court overruled Canterbury's objections to the magistrate's decision and entered judgment in Stiffler's favor in the amount of $1,391.52. (Doc. #17). Canterbury then filed a timely appeal, advancing the two assignments of error set forth above.
 Upon review, we find both assignments of error to be unpersuasive. In its first assignment of error, Canterbury contends that the Vandalia Municipal Court lacked subject-matter jurisdiction to hear Stiffler's complaint. It is well settled that a municipal court, as a court of limited jurisdiction, lacks subject-matter jurisdiction over an action if the action does not fit within one of the categories set forth in R.C. § 1901.18. In the present case, Canterbury contends that Stiffler's pro se complaint for money damages fails to specify any cause of action at all. As a result, Canterbury insists that she failed to establish subject-matter jurisdiction under R.C. § 1901.18 and that the Vandalia Municipal Court therefore lacked jurisdiction over her complaint.
We find the foregoing argument to be without merit. "In order to determine the nature of an action or claim brought in a municipal court, the court must consider the allegations of the pleadings, the issues tendered, and the prayer of the complaint." National City Bank v.Fleming (1981), 2 Ohio App.3d 50, 53. In the present case, Stiffler's complaint sought money damages to compensate her for property damage, the cost of moving, and utility expenses. The prayer of the complaint requested a judgment in the amount of $2,000. Although the complaint itself did not specify a particular cause of action, Canterbury's answer, which is part of the pleadings, set forth affirmative defenses of accord and satisfaction, laches, waiver, estoppel and fraud. (Doc. #5). In addition, the answer made clear that Stiffler's complaint involved a lease agreement. Finally, the issues tendered at trial plainly revealed that the municipal court had subject-matter jurisdiction over this landlord-tenant dispute. Accordingly, we overrule Canterbury's first assignment of error.
In its second assignment of error, Canterbury contends the municipal court erred by finding it liable for money damages as a result of its violation of R.C. Chapter 5321 and its breach of a common law covenant of quiet enjoyment.
In its March 28, 2002, ruling, the municipal court found that Canterbury had failed to make all repairs and do whatever was reasonably necessary to put and keep Stiffler's apartment in a fit and habitable condition, as required by R.C. § 5321.04(A)(2). (Doc. #17 at 3-5). In reaching this conclusion, the court noted that Canterbury was required to remedy the problem in Stiffler's apartment "within a reasonable time considering the severity of the condition and the time necessary to remedy such condition, or within thirty days, whichever is sooner." See R.C. 5321.07(B). In its ruling, the municipal court determined that Canterbury was not entitled to 30 days to remedy the damage to Stiffler's apartment, given the severity of the conditions therein. (Doc. #17 at 4). In fact, the municipal court found that Canterbury acted unreasonably by failing to remedy the damage within the two-week period that started when Stiffler first reported the problem and ended when she vacated her apartment. (Id. at 5). In the municipal court's view, two weeks was an unreasonable length of time "to correct the defects of an uninhabitable apartment on a 30-day, month-to-month lease[.]" (Id.). As a result, the municipal court found that Canterbury had constructively evicted Stiffler and that she was entitled to terminate the rental agreement and to vacate the premises. See R.C. § 5321.07(B)(3).[1]
The municipal court also reasoned that "[t]he damages caused by the series of events which led to the subject apartment being infiltrated by water, sewage, and mold causing[,] among other things, the collapse of the ceiling established through a preponderance of the evidence that the [common law] covenant of quiet enjoyment and the use and benefit of the property occupied by [Stiffler] was unreasonably interfered with by [Canterbury]." (Id. at 4). For this additional reason, the municipal court found that she was constructively evicted and dispossessed of the premises by Canterbury's "unreasonable inaction." (Id. at 5).
On appeal, Canterbury first argues that it did not violate R.C. §5321.04(A)(2). Although Canterbury does not dispute this statutory obligation to make repairs and do whatever was reasonably necessary put Stiffler's apartment in a habitable condition, it stresses that under R.C. § 5321.07(B) it was allowed to make the repairs within "a reasonable time" considering the severity of the condition and the time required to repair it, or 30 days, whichever was shorter. Canterbury then cites trial testimony from its maintenance men to show that it followed a generally accepted method of repairing a leak, namely fixing the source of the leak, puncturing the ceiling to allow water to drain, cutting away a section of the ceiling and removing wet insulation, and then waiting three to four days to allow the area to dry before replacing the drywall, ceiling and paint. (Appellant's Brief at 7). As a result, Canterbury reasons that it did what was "reasonably necessary" to make the apartment habitable. Canterbury also insists that it made the repairs within a reasonable time considering the severity of the condition and the time required to complete the work. In particular, Canterbury suggests that a full 30 days was a reasonable period of time to repair Stiffler's apartment. (Id. at 7-8).
Upon review, we find the foregoing argument to be unpersuasive. Although Canterbury eventually made all repairs and did what was reasonably necessary to put the apartment in a fit and habitable condition, we see no error in the municipal court's ruling that it took an unreasonably long time to do so. In reaching this conclusion, we reject Canterbury's suggestion that 30 days was a reasonable repair period in the present case. In its ruling, the municipal court noted that the damage to Stiffler's apartment was depicted in pictures admitted into evidence. We have reviewed those pictures, as well as the trial testimony, and find no error in the municipal court's determination that the damage rendered the apartment uninhabitable. Stiffler's apartment was infiltrated with leaking water, sewage, growing mold, soaked carpets, and a sagging ceiling. She reasonably feared using her electricity given the abundance of water in the area, and she reasonably feared using her kitchen or her cookware given the report of an overflowing upstairs toilet. In our view, the record fully supports the municipal court's determination that "[t]he facts in this case do not justify the argument of [Canterbury that] it ha[d] 30 days to correct the defect." (Doc. #17 at 4).
As noted above, however, R.C. § 5321.07(B) allowed Canterbury to make its repairs within 30 days or within a reasonable time, whichever was shorter. Having found that Canterbury was not entitled to 30 days to repair Stiffler's apartment, the remaining question is whether she gave the appellant "reasonable time" to do so. After considering the severity of the problem in Stiffler's apartment and the time required to remedy it, we find no error in the municipal court's determination that even two weeks was an unreasonably long period of time for Canterbury to make the apartment habitable. In reaching this conclusion, we note that Stiffler first reported a leak on May 27, 2001. At that time, a maintenance man poked a hole in her kitchen ceiling to relieve the pressure and to allow the water to drain. (Tr. at 10). He also assured Stiffler that someone would repair the leak on Tuesday, May 29, 2001. (Id.). On that day, she left several messages at the apartment office, but no one returned her calls or repaired the leak. (Id.). After repeated calls to the office, Stiffler finally reached Kammer on Thursday, May 31, 2001. (Id. at 58). "Moe from maintenance" then erroneously concluded that an out-of-place upstairs shower curtain had caused the leak. (Id. at 58-59, 87-88, 95-96). He later determined that the upstairs tenant's toilet was overflowing. (Id. at 97). As a result, he fixed the toilet and poked a hole in Stiffler's bathroom ceiling. (Id.). No other actions were taken until June 4, 2001, when Stiffler reported that her apartment was flooded and her "ceilings were ready to cave in." (Id. at 59). At that time, Moe punctured her kitchen and bathroom ceilings to allow the water to drain, and the other maintenance man extracted approximately 10 gallons of water from her carpet. (Id. at 34, 60, 116, 119). At some point, Moe also determined that the upstairs tenant's dishwasher line was leaking and causing water to flow into Stiffler's apartment. (Id. at 97-98). After fixing the dishwasher, Moe returned to her apartment and removed a three-foot by three-foot section of her ceiling, which had partially "caved in," and removed the wet insulation. (Id. at 60, 78, 99). Kammer then told Stiffler that the ceiling would need to dry for three or four days before it could be repaired. Five days later, however, on June 9, 2001, Stiffer vacated her apartment because it had not been repaired. (Id. at 37-38).
The foregoing facts demonstrate that for four days from May 27, 2001, until May 31, 2001, Canterbury took no action, other than poking a hole in Stiffler's ceiling. Moe then realized that he had misdiagnosed the problem, and he poked another hole in Stiffler's ceiling. Canterbury essentially took no additional action for four more days from May 31, 2001, until June 4, 2001. At that time, Moe and another repair man fixed a leak and cut a hole in the ceiling. Although Stiffler was told that the ceiling would need three or four days to dry, it was not repaired five days later when she vacated the apartment. In light of these facts, we cannot say that the municipal court erred in finding that even 14 days was an unreasonably long period of time for Canterbury to make its repairs and put the premises in a habitable condition. As a result, we agree with the municipal court's determination that Canterbury breached its statutory duty to make the necessary repairs within a reasonable time, and we find Canterbury's argument under R.C. Chapter 5321 to be unpersuasive.
In a final argument, Canterbury contends that it did not breach the common law covenant of quiet enjoyment. In support of this argument, however, Canterbury asserts only that its statutory argument regarding R.C. Chapter 5321 applies equally to the common law claim. (Appellant's Brief at 9-10). Having determined above that Canterbury violated R.C. Chapter 5321 by failing to repair Stiffler's apartment within a reasonable time, we find Canterbury's continued reliance on its statutory argument to be unpersuasive. Given that Canterbury advances no other argument concerning its breach of the covenant of quiet enjoyment, we need not further address the issue. Accordingly, we overrule Canterbury's second assignment of error and affirm the judgment of the Vandalia Municipal Court.
Judgment affirmed.
FAIN, J., and GRADY, J., concur.
[1] In order to terminate a rental agreement and vacate an apartment due to a landlord's failure to make needed repairs within a reasonable time, a tenant such as Stiffler must (1) give written notice of the defect at issue and (2) be current in her rent payments. See R.C. §5321.07. In the present case, Canterbury does not argue on appeal that Stiffler failed to fulfill either of these requirements.